UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KADEEM ARRINDELL-MARTIN,

                          Plaintiff,

                                                            5:18-CV-0780
v.                                                          (GTS/MJK)

JASON EIFFE, Police Officer, in his individual
capacity; JEFFREY BALLAGH, Police Officer, in
his individual capacity; and EDWARD FALKOWSKI,
Police Officer, in his individual capacity,[1]

                          Defendants.
_____

APPEARANCES:                                   OF COUNSEL:

THE OFFICES OF FRED LICHTMACHER P.C.           FRED B. LICHTMACHER, ESQ.
    Counsel for Plaintiff[2]
116 West 23rd Street, Suite 500
New York, NY 10011

HANCOCK ESTABROOK, LLP                         JOHN G. POWERS, ESQ.
    Counsel for Defendants                     MARY L. D'AGOSTINO, ESQ.
1800 AXA Tower I
100 Madison Street
Syracuse, NY 13202

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

        Currently before the Court, in this civil rights action filed by Kadeem Arrindell-Martin

_____

[1]      Defendants City of Syracuse and the Police Chief of the Syracuse Police Department
were terminated from this action on December 18, 2018.  (Dkt. No. 16.)   The caption has also
been amended to correct mistakes or misspellings regarding the names of Plaintiff and Defendant
Falkowski.

[2]      According to a letter-brief submitted by Plaintiff on November 30, 2022, his co-counsel,
Attorney Steven T. Halperin, passed away during the pendency of the present motions.   (Dkt.
No. 132.)

("Plaintiff") against Jason Eiffe, Jeffrey Ballagh, and Edward Falkowski ("Defendants"), are (1) three individual motions for summary judgment pursuant to Fed. R. Civ. P. 56 submitted by each of the remaining Defendants, and (2) three individual motions to strike portions of Plaintiff's responses to the Statements of Material Facts related to the motions for summary judgment. (Dkt. Nos. 106, 107, 115, 129, 130, 131.)   For the reasons set forth below, the Defendants' motions for summary judgment are granted, their motions to strike are granted, and Plaintiff's Complaint is dismissed.

## I.      RELEVANT BACKGROUND

### A.      Plaintiff's Complaint

Generally, in his Complaint, Plaintiff asserts three claims that remain in this action.[3] (Dkt. No. 1.)   First, Plaintiff claims that the individually named Defendants unlawfully subjected him to excessive, unreasonable, and potentially deadly force in violation of 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution in that Defendants shot him, causing him to suffer a gunshot wound in his abdomen ("Claim One").   (*Id.* at ¶¶ 41-46.)

Second, Plaintiff claims that the individually named Defendants failed to intervene to prevent the aforementioned use of excessive force in violation of 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution by failing to stop the relevant officer (later identified as Defendant Falkowski) from shooting him ("Claim Two").   (*Id.* at ¶¶ 47-52.)

Third, Plaintiff claims that the individual Defendants violated 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution by failing to provide timely and adequate medical care related to his gunshot wound ("Claim Three").   (*Id.* at ¶¶ 53-59.)

---

[3]      Plaintiff also asserted a *Monell* claim against the City of Syracuse and the Police Chief of the Syracuse Police Department, but that claim was dismissed by a Decision and Order dated

**B.     Undisputed Material Facts on Defendants' Motions for Summary Judgment**

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises."   N.D.N.Y. L.R. 56.1(b).   This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties."   *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]).   Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'"   *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]).   "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."   N.D.N.Y. L.R. 56.1(b).

Defendants have each filed motions to strike various specific portions of Plaintiff's responses to their asserted Statements of Material Facts.   (Dkt. Nos. 129, 130, 131.)   The specific arguments regarding the portions that the Defendants seek to strike relate to what they view as deficiencies in the Plaintiff's responses to their Statements of Material Facts, such as failure to cite to evidence that supports a denial or specifically controverts the asserted fact, and

---

December 18, 2018.   (Dkt. No. 16.)

the improper addition of facts or argument.   These arguments have been considered as part of the analysis when formulating the statement of material facts that have not been properly disputed found below, and have, as will be discussed related to the specific asserted facts, generally been accepted by the Court.

Further, although all three individual Defendants filed their own separate motions with separately asserted Statements of Material Facts, those statements of fact are essentially identical.   They have therefore been consolidated here into a single statement of material facts that have not been disputed.

### Events of July 22, 2015

1.      On July 22, 2015, several members of Syracuse Police Department's Special Investigations Division ("SID"), Narcotics Section were assigned to the east side of the City of Syracuse as part of a narcotics "street corner interdiction detail," in response to recent gang-related homicides.

2.      As part of this assignment, the leader of the detail, Detective Susan Izzo, decided to conduct surveillance of Lexington Park (now known as Loguen Park) from a church parking lot across the street from the park to monitor the area for potential narcotics transactions.

3.      The members of the corner interdiction detail included (among others) Detectives Jeffrey Ballagh, Jason Eiffe, Edward Falkowski, William "Bo" Summers, Sean Ryan, Scott Henderson, Eric Braun, Alp Llukaci, David Proud, Mike Hartnett, and Kelly Baart.

4.      The SID members involved in the street corner interdiction detail worked either in one of two teams: a surveillance team or an arrest team.

5.      The surveillance team consisted of Detective Baart, Detective Ryan, and

Detective Izzo.

6.      The arrest team – also referred to as "take down units" – was comprised of four pairs of officers: (a) Defendant Ballagh and Defendant Eiffe; (b) Defendant Falkowski and Detective Summers; (c) Detective Henderson and Detective Braun; and (d) Detective Dan Babbage and Detective David Metz.

7.      All members of the arrest team wore black tactical vests carriers.[4]

8.      The black tactical vest displayed the word "POLICE" in bold, block letters on the front and back.[5]

9.      On the interdiction detail near Lexington Park on July 22, 2015, each of the named Defendants wore black tactical vest carriers that displayed the word "POLICE" in bold, block letters on the back.[6]

10.     On the interdiction detail near Lexington Park on July 22, 2015, each of the named Defendants wore black tactical vest carriers that displayed their police badges and also displayed the word "POLICE" in bold, block letters on the front.[7]

11.     On July 22, 2015, immediately prior to the incident, Defendants Eiffe and Ballagh

---

[4]      Plaintiff denies this asserted fact, citing to a portion of the deposition testimony of Defendant Ballagh.  (Dkt. No. 122, Attach. 6, at ¶ 7.)   However, as Defendants argue in their motions to strike, in the portion of the testimony cited, Defendant Ballagh was talking about whether members of the *surveillance* team would have been wearing anything identifying themselves as police; he did not address what members of the *arrest* team were wearing or whether they would generally wear items identifying them as police.   (Dkt. No. 106, Attach. 3, at 58 ¶ 12 – 59 ¶ 24; Dkt. No. 129, Attach. 1, at 4-5.)   Because the evidence cited by Plaintiff therefore does not actually dispute the asserted fact that the arrest team, rather than the surveillance team, were wearing such tactical vests, this asserted fact is deemed to be admitted.

[5]      This asserted fact is deemed admitted for the reasons discussed in Note 4 above.

[6]      This asserted fact is deemed admitted for the reasons discussed in Note 4 above.

[7]      This asserted fact is deemed admitted for the reasons discussed in Note 4 above.

(members of the arrest team) were positioned inside a maroon Crown Victoria (also described as a "take down" vehicle) which was fitted with publicly visible license plate readers on the trunk and emergency lights at the front and rear, near Columbus Avenue and East Fayette Street.

12.   Defendant Eiffe was seated in the driver's seat of that vehicle, while Defendant Ballagh was seated in the front passenger seat.[8]

13.   Defendant Falkowski and Detective Summers (members of a separate arrest team) were positioned inside of a light green Ford Crown Victoria, which was fitted with emergency lights at the front and back, near Westcott Street and the 200 block of Lexington Avenue.[9]

14.   Defendant Falkowski was positioned in the driver's seat of that vehicle, while Detective Summers was positioned in the front passenger seat.

## **Observations Consistent With a Street-Level Narcotic Sale**

15.   While conducting surveillance, Detective Izzo observed a male wearing a camouflage baseball cap, white t-shirt, and camouflage pants approach a parked tan sedan on foot on the south curb line on the 100 block of Lexington Avenue.

16.   Detective Izzo watched as the male in the camouflage baseball cap and camouflage pants leaned into the driver's side compartment of the tan sedan.

17.   Plaintiff testified that on July 22, 2015, while leaving Lexington Park on foot, he approached a tan sedan and spoke to a man in the driver's seat who he knew by the name

---

[8]   Plaintiff does not dispute this fact, but states that "there is no testimony we can find saying the emergency lights were activated."   (Dkt. No. 122, Attach. 6, at ¶ 12.)   Given that the asserted fact says nothing about whether the emergency lights were activated, it is not clear how such an uncited assertion relates to the asserted fact, nor is Plaintiff's assertion of such an uncited fact in this manner appropriate under the Local Rules.   The asserted fact is therefore deemed to be admitted and Plaintiff's additional statements will be disregarded.

[9]   This fact is deemed to be admitted for the same reasons discussed above in Note 8.

6

"K-Shop" or "Kool" through the open driver's window for about a minute, but he did not remember what they talked about.

18.     Detective Izzo radioed to Detective Baart and requested that she drive by the tan sedan to take a closer look.

19.     As Detective Baart drove by the tan sedan, she radioed that she observed a male driver inside the tan vehicle and that she observed plastic packaging and money being exchanged between Plaintiff and the driver.[10]

20.     Based on the training and experience of the SID officers, Detective Baart's observations were consistent with a street-level narcotic sale.

21.     In addition, based on the training and experience of the SID officers, the officers believed that the individual in the tan sedan was likely the "customer" or "buyer," while Plaintiff, *i.e.*, the individual in the camouflage pants, was the "seller."

22.     As a result of her direct observations, Detective Baart indicated that the arrest teams could interdict the transaction under surveillance.

### Defendants Eiffe and Ballagh Approach the Tan Sedan

23.     In response to the surveillance team's radio transmissions, Defendant Eiffe began to drive the maroon Crown Victoria towards the 100 block of Lexington Avenue by first driving southbound on Cherry Street and then turning east onto Lexington Avenue.

---

[10]     Plaintiff denies this asserted fact, pointing to his own deposition testimony to support his assertion that no plastic packaging or money was exchanged.   (Dkt. No. 122, Attach. 6, at ¶ 19.) Although Plaintiff is correct that this evidence would seem to create a dispute as to whether plastic packaging or money was actually exchanged, it does not address the asserted fact itself, which is that Detective Baart radioed that she had seen such things being exchanged.   Whether Detective Baart's statement was itself a correct interpretation of events is not the subject of this asserted fact.   Because Plaintiff has not provided any evidence to dispute that Detective Baart did indeed radio such information, this fact is deemed to be admitted.

24.     Defendant Eiffe parked the maroon Crown Victoria behind the tan sedan, and he

and Defendant Ballagh exited the vehicle and approached the tan sedan from the rear, with

Ballagh on the grass to the right rear of the passenger side, and Eiffe in the street to the left rear

of the tan sedan.[11]

25.     The configuration and location of the maroon Crown Victoria and the tan sedan is

accurately depicted in the photograph below:



26.     After exiting his vehicle, Defendant Eiffe began to approach the driver's side of

---

[11]     Plaintiff does not expressly state whether he denies or admits this fact, but states only that
he did not see anyone on foot in the middle of the street, citing to his deposition testimony.
(Dkt. No. 122, Attach. 6, at ¶ 24.)   This is failure to expressly deny a fact is improper under
N.D.N.Y. L.R. 56.1.   In any event, whether or not Plaintiff saw Defendant Eiffe in the middle of
the street does not dispute the evidence presented that Defendant Eiffe was, indeed, standing in
the street.   *Cf. Genger v. Genger*, 663 F. App'x 44, 49 n.4 (2d Cir. 2016) (summary order)
(noting that a statement that one "ha[d] no recollection" of a fact "does not constitute a denial").
As such, this asserted fact is deemed to be admitted.

the tan sedan on foot in the street.[12]

27.    At the same time, Defendant Ballagh also exited the maroon Crown Victoria and began to approach the passenger side of the tan sedan.

28.    Around the time of the arrival of Defendant Eiffe's car, another takedown vehicle – a light green Crown Victoria containing Defendant Falkowski and Detective Summers – approached Lexington Avenue from the east (Columbus Avenue) to block off the opposite end of Lexington Avenue.

29.    The vehicle with Defendant Falkowski and Detective Summers had been informed by the surveillance team that a second, dark-colored sedan was attempting to make a U-turn and leave the scene, so Defendant Falkowski blocked the road by parking his green car at an angle facing the front of Plaintiff's dark-colored vehicle.

30.    At the time Defendant Falkowski's green take-down vehicle was facing the front of Plaintiff's vehicle, Defendant Eiffe was on foot in the street, behind Plaintiff's vehicle and level with the rear of the tan sedan.[13]

31.    Defendant Eiffe then heard the sound of an engine revving and tires "screeching" or "squealing" in front of him, which prompted him to look up.[14]

---

[12]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 11.

[13]    Plaintiff seemingly denies this fact, asserting in response that he did not see anyone in the street behind him, relying on his own deposition.   (Dkt. No. 122, Attach. 6, at ¶ 31.)   However, setting aside the believability of Plaintiff's deposition testimony under *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir. 2005) (which is discussed below in Part III.A. of this Decision and Order), again, whether or not (in all the excitement) he saw Defendant Eiffe behind him does not dispute the presented evidence that Defendant Eiffe was, in fact, behind his vehicle.   This asserted fact is therefore deemed admitted.

[14]    Plaintiff appears to deny this asserted fact, stating that he was not going fast enough for his tires to "screech."   (Dkt. No. 122, Attach. 6, at ¶ 32.)   However, setting aside the believability of Plaintiff's deposition testimony under *Jeffreys*, the evidence provided by

32.     When he looked up, Defendant Eiffe observed Plaintiff's car, a dark-colored sedan, accelerating in reverse and fishtailing backwards in his direction.[15]

33.     Believing he was going to be imminently struck by Plaintiff's vehicle, Defendant Eiffe first began to run west on Lexington Avenue.[16]

34.     As Defendant Eiffe ran and tried to maneuver out of Plaintiff's way, Plaintiff steered the vehicle in Defendant Eiffe's direction, leading him to believe that Plaintiff was intentionally aiming the vehicle at him.[17]

35.     Although Defendant Eiffe believed that Plaintiff's maneuvering was an attempt to hit and kill him, he did not unholster his service-issued firearm.[18]

---

Defendants indicates that Defendant Eiffe indeed reported that he looked up at the sound of an engine revving and heard the sound of tires either "screeching" or "squealing."  (Dkt. No. 106, Attach. 5, at 93, lines 16-21; Dkt. No. 106, Attach. 25, at 3.)   Plaintiff's cited deposition testimony of "not that fast" in response to a question regarding how fast he was reversing at the relevant time does not adequately dispute the asserted fact.   This asserted fact is therefore deemed admitted.

[15]     Plaintiff appears to deny this asserted fact, citing to deposition testimony in which he stated that he did not see anybody on foot as he was reversing at that time.  (Dkt. No. 122, Attach. 6, at ¶ 33; Dkt. No. 106, Attach. 2, at 78, lines 8-10.)   However, again, setting aside the believability of Plaintiff's deposition testimony under *Jeffreys*, the fact that Plaintiff (in all the excitement) simply did not see Defendant Eiffe in the street does not dispute the evidence indicating that Defendant Eiffe was on foot in the street.   This asserted fact is therefore deemed admitted.

[16]     Plaintiff's attempted denial of this asserted fact is insufficient for the reasons discussed above in Note 15.

[17]     Plaintiff appears to deny this asserted fact, but his explanation does not address the fact asserted and instead adds unrelated facts.  (Dkt. No. 122, Attach. 6, at ¶ 35.)   Specifically, although Plaintiff asserts that "no one was in the road," his cited testimony was only that he did not see anyone in the road.  (Dkt. No. 106, Attach. 2, at 78, 81-82.)   Because the fact that Plaintiff may not have seen anyone in the road does not actually contradict Defendant Eiffe's evidence that he was in the road, this fact has not been properly disputed and is deemed to be admitted (even setting aside the believability of Plaintiff's deposition testimony under *Jeffreys*).

[18]     Plaintiff denies this asserted fact, stating that, because he heard gunshots as he began

36.     Instead, Defendant Eiffe ran up the north sidewalk on Lexington Avenue to avoid being hit by Plaintiff.[19]

37.     As Defendant Eiffe crossed the north curb of Lexington Avenue and headed for the sidewalk to take cover near a tree, the rear of Plaintiff's car turned in his direction.[20]

38.     Plaintiff's vehicle came within feet of striking Defendant Eiffe.[21]

39.     Plaintiff then abruptly changed directions and continued driving in reverse while travelling westbound on Lexington Avenue towards the intersection of Cherry Street.

40.     Defendant Falkowski witnessed Plaintiff drive in reverse toward the sidewalk where Defendant Eiffe was standing and believed at the time that Plaintiff had struck Defendant Eiffe, while Defendant Ballagh believed that Plaintiff was trying to hit Defendant Eiffe.[22]

---

reversing his vehicle at the relevant time, he disputes that Defendant Eiffe's service weapon was holstered.  (Dkt. No. 122, Attach. 6, at ¶ 36.)   However, the fact that Plaintiff alleges that he heard gunshots at that time is in no way evidence that Defendant Eiffe specifically had his service weapon drawn, much less that those gunshots came from Defendant Eiffe's service weapon.   Indeed, Plaintiff testified at his deposition that, while reversing at the relevant time, he did not see anybody with a pistol in their hand.  (Dkt. No. 106, Attach. 2, at 74-75.)   This asserted fact is therefore deemed to be admitted.

[19]     This fact is deemed admitted for the same reasons that were discussed above in Notes 15 and 17.

[20]     Plaintiff appears to deny the asserted fact, but, rather than addressing the substance of that asserted fact, he merely adds explanation or additional facts.   (Dkt. No. 122, Attach. 6, at ¶ 38.)   Because those additional facts do not actually serve to dispute the asserted fact, such asserted fact is deemed to be admitted.

[21]     Plaintiff purports to deny this asserted fact, but the evidence cited does not dispute the evidence proffered by Defendants.   (Dkt. No. 122, Attach. 6, at ¶ 39.)   This asserted fact is therefore deemed to be admitted.

[22]     Plaintiff denies Defendants' originally asserted fact, stating that neither Defendant Falkowski nor Defendant Ballagh ever stated that they witnessed plaintiff "almost strike" Defendant Eiffe.   (Dkt. No. 122, Attach. 6, at ¶ 41.)   Plaintiff is correct that the portions of those sources' depositions cited by these two Defendants do not indeed indicate they saw Plaintiff "almost strike" Defendant Eiffe.   (Dkt. No. 106, Attach. 3, at 108; Dkt. No. 106,

41.      Defendant Falkowski originally believed that Defendant Eiffe had been struck by Plaintiff's vehicle based on what he witnessed and did not learn otherwise until after the entire incident was over.

42.      Plaintiff admits that he accelerated in reverse away from Defendant Falkowski's vehicle.

43.      Plaintiff did not know how fast he was going in reverse.[23]

44.      Plaintiff testified that he did not see Defendant Eiffe on foot behind him when he started reversing because he "wasn't really paying attention to anybody on the street or anything like that."

45.      Plaintiff testified that, while he was driving in reverse down Lexington Avenue, he "could have injured somebody on foot, yes [he] could have, yes."

**Plaintiff's Collision with Defendant Falkowski's Vehicle While In Pursuit**

46.      Plaintiff continued to drive down the length of Lexington Avenue in reverse and towards the intersection of Lexington Avenue and Cherry Street.

47.      Defendant Falkowski pursued Plaintiff in his light Green Crown Victoria.[24]

---

Attach. 4, at 116-17.)   However, both did indicate their beliefs about what was occurring based on what they were witnessing at the time.   In the absence of any apparent contrary evidence, the asserted fact has been revised to more accurately reflect the testimony cited by Defendants.

[23]      Plaintiff does not appear to deny this asserted fact, but stated that he was not going "that fast."   (Dkt. No. 122, Attach. 6, at ¶ 44.)   This is not a denial, but an improper addition of facts. Because the evidence supports that Plaintiff was unaware of his rate of speed, the asserted fact is deemed to be admitted (setting aside the believability of Plaintiff's deposition testimony under *Jeffreys*).

[24]      Although it is undisputed that Defendant Falkowski at some point drove towards Plaintiff's vehicle in his own vehicle, there appears to be a genuine dispute presented by the cited evidence regarding whether that event occurred while Plaintiff was still reversing (as indicated in evidence cited by Defendants) or whether it occurred after Plaintiff had already come to a stop near Cherry Street (as indicated by Plaintiff's deposition).   However, as will be discussed in

48.     Both Defendants Eiffe and Ballagh reported witnessing Plaintiff's car striking Defendant Falkowski's car, as both Eiffe and Ballagh were running on foot after the cars.[25]

49.     According to Defendant Eiffe, from his vantage point on foot, Defendant Eiffe first *heard* the collision and the sound of an engine revving.

50.     According to Defendant Ballagh, Plaintiff's car struck Defendant Falkowski's "car with so much force that it lifted [Plaintiff's] rear wheels off the ground [and] [Defendant Falkowski's] car had been spun around and [Plaintiff's] car was impacting the driver's side of [Defendant Falkowski's] car."

51.     Detective Izzo also reported witnessing the collision, describing it as the "guy in the gray car then purposefully rammed its rear end into [Defendant Falkowksi's] car and then slammed into the side of [Defendant Falkowski's] car, sending [Defendant Falkowski's] car sideways."

52.     Photographs taken of Defendant Falkowski's car after the pursuit depict

---

greater detail in the Analysis section of this Decision and Order, Plaintiff's Notice of Claim appears to conflict with his later deposition by suggesting that Defendant Falkowski's vehicle approached him either while he was still reversing or very soon after he had stopped.   (Dkt. No. 106, Attach. 2, at 223.)   In any event, for the purposes of this fact in the Statement of Facts, the Court will adhere to the facts that appear purely undisputed, without addressing the question of whether Plaintiff's testimony can be credited under *Jeffreys*; and therefore the Court has omitted a portion of this fact as originally asserted by Defendants (stating "pulling alongside of him and yelling out his window for Plaintiff to pull over"), because it is immaterial under the circumstances.

[25]     Plaintiff appears to deny this asserted fact, citing to his own deposition testimony in stating that "Plaintiff's vehicle was not traveling at the time of the collision with Defendant Falkowski's vehicle."   (Dkt. No. 122, Attach. 6, at ¶ 50.)   While, as discussed earlier, there is a seeming genuine dispute as to where Plaintiff's vehicle was and whether it was moving at the time of a collision with Defendant Falkowski's vehicle, Plaintiff's cited evidence does not directly contradict the asserted fact, which addressed what Defendants Eiffe and Ballagh reported witnessing, nor does it say anything about what those Defendants were doing at the time of the collision, wherever it occurred.   This asserted fact is therefore largely deemed to be admitted.

significant damage from the collision with Plaintiff's vehicle:



53.     The collision was so severe that Defendant Falkowski had to kick his door to open it.

**Plaintiff's Near Miss on Defendants Falkowski, Eiffe, and Ballagh**

54.     After this collision between Plaintiff's dark sedan and Defendant Falkowski's green Crown Victoria, Defendant Falkowski exited his vehicle and unholstered his firearm, pointing it at Plaintiff and ordering him to place his hands in the air.[26]

55.     At the same moment, Defendants Ballagh and Eiffe were arriving on foot to the end of Lexington Avenue (near the intersection of Cherry Street) and were positioned off to the front right of Plaintiff's car.

56.     As Defendant Eiffe reached the front end of Plaintiff's vehicle, he yelled at Plaintiff to "show [me] his hands."[27]

---

[26]     Plaintiff appears to deny this asserted fact, stating that "[a]fter the collision, Plaintiff, laying down to avoid being shot again, managed to put his car into a lower gear, and drive forward."  (Dkt. No. 122, Attach. 6, at ¶ 57.)   However, this adding of facts does not actually deny that Defendant Falkowski did what is stated in the asserted fact.   This asserted fact is therefore deemed to be admitted.

[27]     Plaintiff attempts to deny this asserted fact but his assertion that no officers gave any commands following the collision is not supported by the evidence he cites.   (Dkt. No. 122, Attach. 6, at ¶ 59.)   This asserted fact is therefore deemed to be admitted.

14

57.     Instead of showing his hands, however, Plaintiff accelerated his vehicle towards Defendants Eiffe, Ballagh, and Falkowski.[28]

58.     Defendant Eiffe believed that Plaintiff was attempting to "strike me and run me over" for a second time.[29]

59.     As Defendant Eiffe stepped to his right "to try to get out of the way of the car," he discharged his firearm at Plaintiff three or four times.[30]

60.     When Defendant Eiffe discharged three or four rounds, he was approximately 10 or 15 feet from Plaintiff's car.[31]

61.     Defendant Eiffe's three or four rounds were discharged in rapid succession, in less than 20 seconds.

62.     Although Defendant Falkowski heard other rounds being discharged at the same time he was firing, he did not see anyone else (including Defendants Eiffe and Ballagh) firing their weapons.

63.     Defendant Eiffe was not aware that any other officers were firing except for him.

64.     Defendant Ballagh also discharged his service weapon at Plaintiff's vehicle at the same time that Plaintiff was driving at him.

---

[28]     Plaintiff denies the asserted fact, but the evidence he cites does not support that denial. (Dkt. No. 122, Attach. 6, at ¶ 60.)   Rather, the cited deposition testimony states only that Plaintiff did not see anyone on foot in front of him, although he acknowledged that, at that point, he was "just trying to get away," and "it wasn't something I was looking for."   (Dkt. No. 106, Attach. 2, at 97.)   This asserted fact is therefore deemed to be admitted.

[29]     Plaintiff appears to deny this asserted fact by again stating he did not see anyone in the vicinity of his vehicle.   (Dkt. No. 122, Attach 6, at ¶ 62.)   This denial is insufficient for the reasons already discussed in Note 28.

[30]     Plaintiff's denial is insufficient for the same reasons discussed in Note 28.

[31]     Plaintiff's denial is insufficient for the same reasons discussed in Note 28.

65.     Although Defendant Eiffe was able to hear his own first round being discharged, he did not hear the discharge of his remaining rounds or any rounds being discharged by any other weapons.

66.     All of the shell casings found at the scene were at the location of this third incident near the end of Lexington Avenue by Cherry Street, 250 feet away from the location Plaintiff first started reversing his car:



67.     Plaintiff was hit by only one bullet, which was fired by Defendant Falkowski.

68.     Plaintiff's vehicle did not stop as a result of the discharge of that round but continued to travel east on Lexington Avenue, until the vehicle suddenly turned into Lexington Park and came to rest.

**Police Requests for Medical Assistance and Provision of First Aid**

69.     Once Plaintiff's vehicle came to rest in Lexington Park, Defendant Ballagh, Detective Braun, Detective Babbage, and Detective Henderson immediately began rendering first aid after Plaintiff was put in handcuffs.

70.     Plaintiff testified that as soon as he was put in handcuffs, unknown individuals applied pressure on his wounds until the ambulance arrived.

71.     As he ran towards Lexington Park to assist other responding officers, Defendant Eiffe broadcasted at 2:25:16 p.m.: "836, we got [sic] shots fired over here. Lexington Park, shots fired."

72.     Detective Baart and Defendant Falkowski both requested a "78," meaning an ambulance, within the very same minute of Defendant Eiffe's radio transmission.

73.     Less than one minute after having been notified of the incident, dispatch confirmed at 2:26:03 p.m.,"We'll start the ambulance."

74.     The ambulance from Rural Metro arrived at approximately 2:32 p.m., seven minutes after the "shots fired" announcement was made.

75.     Plaintiff arrived at Upstate University Hospital via the Rural Metro ambulance at 2:47 p.m.

## Plaintiff's Indictment and Guilty Plea

76.     Plaintiff was indicted by an Onondaga County Grand Jury on five charges: (1) two counts of Attempted Aggravated Assault on a Police Officer, N.Y. Pen. L. § 110.00/120.11; (2) Reckless Endangerment in the First Degree, N.Y. Pen. L. § 120.25; (3) Reckless Endangerment in the Second Degree, N.Y. Pen. L. § 120.20; and (4) Unlawfully Fleeing a Police Officer in a Motor Vehicle in the Third Degree, N.Y. Pen. L. § 270.25.

77.    On October 21, 2016, Plaintiff appeared with his counsel, Charles A. Keller, Esq., before the Honorable Thomas J. Miller and entered a plea of guilty to the charge of Reckless Endangerment in the Second Degree, in full satisfaction of all the charges contained in the indictment.

78.    During the plea allocution, Plaintiff pled guilty to the charge and admitted to the conduct as being true, specifically "that on or about July 22, 2015, in the City of Syracuse . . . [he] recklessly engaged in conduct which created a substantial risk of serious physical injury to another person."

79.    Upon Plaintiff's plea, the County district attorney represented to the criminal court that the plea agreement "was reached with the agreement of the Chief of Police, as well as the [police] officers involved," referring to Defendants Eiffe and Falkowski,

80.    Plaintiff's attorney agreed with "everything" in the district attorney's representation made to the court.

81.    The District Attorney's Office involved Defendants Eiffe and Falkowski in the plea negotiations because they were the victims of the alleged criminal conduct, including the charge to which Plaintiff pled.

82.    At the sentencing hearing on January 3, 2017, the Onondaga County District Attorney's Office represented to the court, Plaintiff, and his counsel, that the agreed plea "disposition achieves the People's goal and the defendant's accepting criminal responsibility to his actions in July of 2015, which led to him being shot by the police."

83.    In the view of the Onondaga County District Attorney's Office, each of the five charges contained in the Indictment, including the reckless endangerment charges, reflect

Plaintiff's reckless driving conduct, which occurred prior to his being shot and which placed several Syracuse police officers in danger.

### C.  Parties' Briefing on Defendants' Motions for Summary Judgment

#### 1.  Defendants' Memoranda of Law

Generally, in their memoranda of law, the three Defendants all make similar arguments regarding Plaintiff's three remaining claims. (Dkt. No. 106, Attach. 45, at 11-27; Dkt. No. 107, Attach. 45, at 12-29; Dkt. No. 116, at 13-30.)   First, they argue that they are entitled to summary judgment on Plaintiff's First Claim of excessive force on the following bases: (1) none of the shots fired by either Defendant Eiffe or Defendant Ballagh actually struck Plaintiff, and thus neither of them have been shown to have actually used any force against Plaintiff; (2) Plaintiff's actions while driving, including reversing or driving directly at themselves or other officers on three separate occasions during the encounter, gave them reasonable grounds to believe that there was a risk of imminent harm to those officers or others; (3) Plaintiff is estopped from arguing that his conduct did not pose a significant threat of serious physical injury to others because he pled guilty to a charge of reckless endangerment related to that conduct, and any such argument would run afoul of the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), in that a finding that the Defendants' conduct was unlawful would essentially invalidate that conviction; and (4) Defendants are entitled to qualified immunity because there is no clearly established right in the relevant caselaw as to the type of circumstances presented here.   (Dkt. No. 106, Attach. 45, at 11-24; Dkt. No. 107, Attach. 45, at 12-25; Dkt. No. 116, at 13-23.) Defendants also argue that, in the alternative, the Court should apply *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), and decline to allow Plaintiff to rely on his deposition

testimony to create material issues of fact, given that his deposition testimony materially

conflicts with the account of the incident that he had provided in his earlier Notice of Claim.

(Dkt. No. 106, Attach. 45, at 25-27; Dkt. No. 107, Attach. 45, at 26-29; Dkt. No. 116, at 24-30.)

Second, Defendants argue they are entitled to summary judgment on Plaintiff's Second

Claim for four reasons: (1) there was no constitutional violation and therefore no reason to

intervene; (2) neither Defendant Eiffe nor Defendant Ballagh was aware of any violation, in that

they both have testified that they were not aware that any other officer(s) had fired their weapons

at the time the incident was occurring, and Defendant Falkowski testified that he heard gunfire

only at the same time that he himself was firing his weapon at Plaintiff; (3) given where

Defendant Falkowski was located relative to both Defendant Eiffe and Defendant Ballagh and

the rapid nature of the three shots fired by Defendant Falkowksi, there was no realistic

opportunity for either Defendant Eiffe or Defendant Ballagh to intervene to stop Defendant

Falkowski from shooting Plaintiff; and (4) Defendants are entitled to qualified immunity because

there is no precedent clearly establishing a constitutional violation under the circumstances

presented.   (Dkt. No. 106, Attach. 45, at 27-31; Dkt. No. 107, Attach. 45, at 29-32; Dkt. No.

116, at 30-33.)

Third, Defendants argue that they are entitled to summary judgment on Plaintiff's Third

Claim because the evidence unequivocally shows that an officer on the scene applied pressure to

Plaintiff's wound as soon as he had been handcuffed, that multiple officers called in the incident

to dispatch or requested an ambulance within approximately a minute of the reports that shots

had been fired, that an ambulance arrived at the scene only seven minutes after shots were

reported, and that Plaintiff arrived at the hospital within 23 minutes from the original report of

shots.   (Dkt. No. 106, Attach. 45, at 31-34; Dkt. No. 107, Attach. 45, at 32-36; Dkt. No. 116, at 33-36.)

### 2.      Plaintiff's Opposition Memoranda of Law

Generally, in opposition to the Defendants' motions, Plaintiff makes four arguments.[32] (Dkt. Nos. 120, 121, 122.)   First, he clarifies that, regarding the focus of his first two claims, "[Defendant] Falkowski is liable for excessive force and the remaining Defendants, Ballagh and Eiffe are liable for their failure to intervene," based on the fact that the evidence shows that it was Defendant Falkowski's bullet alone that injured Plaintiff.   (Dkt. Nos. 120, at 3; 121, at 3; 122, at 3.)

Second, he states that he "dismisses with prejudice his claim for the failure to provide timely medical care."   (Dkt. Nos. 120, at 9; 121, at 9; 122, at 9.)

Third, regarding his First Claim, which he has now limited to Defendant Falkowski, Plaintiff makes the following three points: (1) the "vehicle-as-weapon" cases on which Defendants have relied to show that Defendant Falkowski had a reasonable belief regarding a risk of harm are distinguishable from the circumstances here, and there remain many genuine issues of material fact, including whether the officers were in the street at the relevant time, when the first shots were fired, and whether the officers had identified themselves as police prior to or during the incident; (2) his plea to and conviction for reckless endangerment does not estop him from pursuing an excessive force claim because there was no specification in that plea that such reckless endangerment was as to the officers themselves as opposed to other persons; and (3) the Court should reject Defendants' request to apply the *Jeffreys* exception because Plaintiff's

---

[32]      Although Plaintiff filed a brief in response to each of the three Defendants' motions, those three briefs are all identical.

testimony is not contradictory or incomplete, and any discrepancies are minor and a result of stress or the passage of time.   (Dkt. Nos. 121, at 3-8; 122, at 3-8; 123, at 3-8.)

Fourth, regarding his Second Claim, which he now admits is asserted only against Defendant Eiffe and Defendant Ballagh, Plaintiff argues that a factfinder could infer that, because Defendant Falkowski admitted to hearing gunshots, the other Defendants also likely heard the other officers' gunshots, and that, because the evidence showed that at least 13 shots were fired at Plaintiff, there is a question for a trier of fact as to whether such shots occurred over a sufficient period of time to allow Defendant Eiffe and Ballagh to intervene.   (Dkt. Nos. 121, at 8-9; 122, at 8-9; 123, at 8-9.)

### 3.   Defendants' Reply Memoranda of Law

Generally, in their reply memoranda of law, Defendants collectively make five arguments.   (Dkt. Nos. 126, 127, 128.)   First, Defendant Falkowski argues that there is no genuine dispute of material fact as to the facts relevant to the question of whether the force he used was reasonable.   (Dkt. No. 128, at 2-6.)   More specifically, he argues that the circumstances of this case are similar to others where courts have found the use of force reasonable, specifically those where a suspect was using a vehicle as a weapon; and he argues further that the facts known to the officers at the time led them to reasonably believe that Plaintiff was involved in the sale of illegal narcotics, that Plaintiff's conduct when police tried to interdict him, including driving at officers and attempting to flee, show that use of force was reasonable, and that no physical evidence supports Plaintiff's assertion that Defendants began shooting at him anywhere other than near the Cherry Street intersection.   (*Id.*)

Second, Defendants Eiffe and Ballagh argue that Plaintiff's Second Claim against them

fails as a matter of law because (1) Plaintiff has offered no evidence to rebut their statements that they were unaware of any other gunfire at the relevant time, and (2) there is no evidence to rebut the provided testimony that Defendant Falkowski fired his three spent rounds in rapid succession, and, in the absence of an issue of fact, the Court is entitled to conclude (as a matter of law) that such rapid action did not leave time for intervention.   (Dkt. No. 126, at 3-7; Dkt. No. 127, at 3-7.)

Third, all three Defendants argue that Plaintiff's guilty plea for reckless endangerment precludes him from asserting a claim of excessive force, because it provides legally binding proof that Plaintiff's conduct during the incident created a substantial risk of serious physical injury and thus proves in a way that Plaintiff cannot controvert that Defendant Falkowski had a reasonable belief that he, the other officers, or bystanders were at risk for serious harm and therefore entitled to use force.   (Dkt. No. 126, at 7-8; Dkt. No. 127, at 7-8; Dkt. No. 128, at 6-8.)

Fourth, all three Defendants argue that application of the *Jeffreys* doctrine to disregard Plaintiff's deposition testimony is appropriate here because the inconsistencies between that testimony and his prior Notice of Claim are neither minor nor inconsequential and he has offered no legitimate reason for those discrepancies.   (Dkt. No. 126, at 9-10; Dkt. No. 127, at 9-10; Dkt. No. 128, at 8-10.)

Fifth, all three Defendants argue that, notwithstanding the merits of the claims asserted, they are entitled to qualified immunity because their actions did not violate any clearly established law.   (Dkt. No. 126, at 10-11; Dkt. No. 127, at 10-11; Dkt. No. 128, at 10-11.)

### 4.    Oral Argument

Per the Defendants' request, the Court heard oral argument on February 27, 2024.   At

that hearing, Defendants argued generally that, although there might be some facts in dispute, the record is sufficient to permit the Court to grant summary judgment for Defendants on all claims, either on the merits or based on qualified immunity.   (Hr'g Tr.)   Specifically, as to the use of force by Defendant Falkowski, Defendants emphasized their theory that the use of deadly force was justified by the fact that circumstances gave rise to a reasonable belief that Plaintiff was attempting to use his vehicle as a weapon to harm the Defendant officers, and that Plaintiff cannot dispute that he was posing such a danger because he pled guilty to reckless endangerment, a charge that inherently involved an admission that he was creating a substantial risk of physical injury to those in the area.   (Hr'g Tr.)   As to the failure-to-intervene claims, Defendants argued those should be dismissed either because summary judgment is warranted on the substantive Fourth Amendment claim, or, in the alternative, because Plaintiff has not adduced any evidence to create a genuine dispute of material fact regarding Defendants Eiffe and Ballagh's lack of awareness that Defendant Falkowski was using force at the relevant time or that they had any reasonable time to intervene in that use of force based on their locations and the speed at which Defendant Falkowski fired the three shots.   (Hr'g Tr.)

Plaintiff argued in response that, generally, summary judgment is inappropriate in this case because there is a material dispute as to many of the relevant facts related to Plaintiff's claims, including when the shooting began, whether Plaintiff saw Defendants on the street, the rate of speed at which Plaintiff's vehicle was reversing, and whether the other Defendants heard Defendant Falkowski firing his weapon.   (Hr'g Tr.)   Plaintiff further argued that the plea to the charge of reckless endangerment cannot be used to collaterally estop his excessive force claim here because the plea allocution contains no information from which it can be inferred that the

24

endangerment to others occurred when he was reversing down the street, as opposed to after the use of force when he drove towards the park.   (Hr'g Tr.)

In reply to Plaintiff's assertion that the plea to the charge of reckless endangerment could have been based on conduct that occurred after the use of force, Defendants argued that such assertion is contradicted by the statements of the judge at his sentencing hearing on that charge. (Hr'g Tr.)   They also argued that Plaintiff's various assertions in his deposition regarding whether he saw anyone on the street and the manner in which his vehicle collided with Defendant Falkowski's vehicle should be disregarded because they are inconsistent with his previous assertions in the Notice of Claim and with the photographic and other evidence.   (Hr'g Tr.)   Defendants further argued that whether Plaintiff's vehicle came to a stop at or before the time Defendant Falkowski fired at Plaintiff is immaterial because, by that point, they had reason to believe Plaintiff posed a serious threat to the safety of the officers and others, and he had engaged in flight already and did not exit the vehicle despite stopping and therefore continued to pose a danger to Defendants.   (Hr'g Tr.)

## II.   LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[33]   As for the materiality requirement, a dispute of fact is

---

[33]      As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."   *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].   As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita Elec.*

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."   *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.   *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."   *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).   However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.   Fed. R. Civ. P. 56(a), (c), (e).[34]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."   *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.   *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.);

---

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[34]      Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 7.1(a)(3).

N.D.N.Y. L.R. 7.1(b)(3).   What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[35]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[36]   Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.   *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL

---

[35]     Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 56.1(b).

[36]     *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.   ANALYSIS

### A.   Whether Summary Judgment is Appropriate on Plaintiff's First Claim

After careful consideration, the Court answers the above question in the affirmative for the reasons stated in the Defendants' memoranda of law.   *See, supra,* Parts I.C.1 and I.C.3 of this Decision and Order.   To those reasons, the Court adds the following analysis.

#### 1.   Sufficiency of Plaintiff's Opposition Evidence Under *Jeffreys*

The first issue raised in Defendants' motions is whether Plaintiff should be permitted to rely on his deposition testimony to create a genuine issue of material fact enabling his claims to survive summary judgment.   Defendants all argue that the Court should apply the Second Circuit's decision in *Jeffreys v. New York*, 426 F.3d 549 (2d Cir. 2005), to find that Plaintiff's deposition testimony, upon which he heavily relies when attempting to refute the Defendants' asserted material facts in this case, is insufficient to create a genuine dispute of material fact, because it is materially inconsistent with previous statements he made under oath regarding the events that occurred on July 22, 2015.   In *Jeffreys*, the Second Circuit upheld the district court's grant of summary judgment despite the fact that, in deciding the summary judgment motion in the defendants' favor, the court had needed to resolve issues of credibility related to the plaintiff's testimony that would ordinarily be reserved for a jury.   *Jeffreys*, 426 F.3d at 553-55. The Second Circuit acknowledged that

> while it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff . . . and thus whether there are any 'genuine' issues of material fact, without making some

assessment of the plaintiff's account.

*Id.* at 554 (internal quotation marks and citations omitted).   Even under such circumstances, however, "the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor."   *Id.* (citing *Fischl v. Armitage*, 128 F.3d 50, 56 [2d Cir. 1997]).   In sum, a court can decline to credit a parties' statements submitted in opposition to a summary judgment motion where (1) there is nothing in the record to support that party's relevant allegations other than their own contradictory and incomplete testimony, and (2) even after drawing all inferences in the light most favorable to the non-moving party, no reasonable person could believe that party's testimony.   *Jeffreys*, 426 F.3d at 555.

The Second Circuit later reiterated that the *Jeffreys* principle is a narrow one.   *Frost v. New York City Police Dept.*, 980 F.3d 231, 246 (2d Cir. 2020).   In *Frost*, the Second Circuit stated that it should be applied only in "the rare circumstance where a witness's testimony is so problematic that no reasonable juror could credit it."   *Frost*, 980 F.3d at 246 (internal quotation marks omitted).   "Where, by contrast, 'there is a plausible explanation for discrepancies in a [witness's] testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete.'"   *Frost*, 980 F.3d at 246 (quoting *Jeffreys*, 426 F.3d at 555 n.2).   It emphasized that, "'in the ordinary case where a district court is asked to consider the contradictory deposition testimony [or declaration] of a fact witness, or where the contradictions presented are not real, unequivocal, and inescapable, the general rule remains that a district court may not discredit a witness's deposition testimony [or declaration] on a motion for summary judgment, because the

assessment of a witness's credibility is a function reserved for the jury.'"  *Frost*, 980 F.3d at 246

(quoting *In re Fosamax Prod. Liab. Litig.*, 707 F.3d 189, 194 n.4 [2d Cir. 2013]).

Whether or not *Jeffreys* should be applied in this case is a fair question and requires

thorough examination.   Plaintiff has presented conflicting statements regarding the incident

involving Defendants, specifically the differing versions of that incident in his Notice of Claim

and at his deposition.   Moreover, in answering the Defendants' Statements of Material Facts,

Plaintiff has relied almost exclusively on his own deposition testimony when attempting to refute

various asserted facts.[37]   (Dkt. No. 133, Attach. 6.)   Thus, whether his deposition testimony is

believable is of great importance to determining whether a genuine dispute of material fact

exists.

In his verified Notice of Claim, filed October 15, 2015, plaintiff provided the following

description of the relevant events.   (Dkt. No. 106, Attach. 2, at 222-25.)   While driving a

vehicle west on Lexington Avenue, Plaintiff pulled over on that street to talk to friends in

Lexington Park, and then to a gentleman in a parked car in the vicinity of where Plaintiff had

stopped his own vehicle.   (*Id.*)   After he finished talking to the man in the car, Plaintiff went

back to his own vehicle and noticed several men in plain clothes approach the man in the parked

car.   (*Id.*)   Plaintiff got back into his own vehicle and began to drive away, initially in an

eastward direction along Lexington Avenue.   (*Id.*)   However, that direction was blocked by the

plain clothes men "who appeared to have closed off the street in the direction that [Plaintiff] was

headed."   (*Id.*)   Plaintiff reversed his vehicle to go west down Lexington Avenue and, while

---

[37]      The only exceptions to this are a citation to the deposition of Defendant Ballagh related
to police tactical vests (Dkt. No. 122, Attach. 6, at ¶¶ 7-10), and citation to portions of the
deposition testimony of Defendant Falkowski and Defendant Ballagh for the proposition that
neither of them saw Plaintiff "almost strike" Defendant Eiffe with the vehicle.   (Dkt. No. 122,

still in reverse, he saw a man running along the passenger side of his vehicle headed toward the front of his vehicle.  (*Id.*)   While the man on the passenger side of the vehicle continued to run in front of the vehicle, another man – who was on the driver's side of the vehicle – fired a shot at Plaintiff.  (*Id.*)   At about the same time this was occurring, a third man in an unmarked vehicle crashed into the driver's side of plaintiff's vehicle and also began shooting at Plaintiff.  (*Id.*)   Plaintiff was hit in the abdomen by one of these bullets.  (*Id.*)   After being shot, he drove "100 feet or so" into the park, where he got out of the vehicle and laid on the ground.  (*Id.*)

However, in both his Complaint, filed on June 30, 2018, and in his deposition, taken on March 18, 2022, Plaintiff presented a different version of events.   According to the allegations in the Complaint, after Plaintiff spoke with people in the park and with a man in a car parked in their vicinity, he got back in his vehicle and began to reverse, intending to execute a U-turn. (Dkt. No. 106, Attach. 2, at 233 ¶¶ 16-20.)   However, while in the process of reversing to execute the turn, he saw a vehicle turn onto Lexington Street and unidentified persons began shooting at him.  (*Id*. at 233 ¶¶ 21-22.)   In response to the shots, he continued in reverse down Lexington, stopping his vehicle when he reached Cherry Street.  (*Id.* at 233 ¶ 23.)   At approximately the same time he stopped his vehicle, the car that had turned onto Lexington crashed into his car and a bullet fired by an unknown shooter in the car entered his torso.  (*Id.* at 233 ¶ 24.)   After being shot, Plaintiff began driving forward to the east down Lexington and drove into the park, where he was stopped by crashing into a tree.  (*Id.* at 234 ¶ 25.)   He fell out of the car and was ordered to lay on the ground.  (*Id.* at 234 ¶ 28.)

In his deposition, this version of events was presented in a more detailed, and yet slightly different, manner.   While driving the vehicle, Plaintiff stopped on Lexington Avenue to talk

Attach. 6, at ¶ 41.)

briefly with some people he knew that he saw in the park there.   (Dkt. No. 106, Attach. 2, at 30.)
While he was walking away from them, he saw a car pull up near where his own vehicle was
parked and he went to talk briefly with the person in that car. (*Id.* at 38-44.)   He then went back
to his own vehicle; he did not see any men approach the other car.   (*Id.* at 58.)   His vehicle was
facing west on Lexington Avenue, and he began to do a turn in order to go east.   (*Id.* at 59-60.)
While he was still reversing for the turn, and before he had a chance to drive to the east, another
vehicle came and blocked the street, although he did not see any men in the street.   (*Id.* at
61-63.)   Seeing that vehicle, he decided to reverse his vehicle into a driveway in order to turn
around again to go west.   (*Id.* at 66-67.)   He did not see anybody on the street.   (*Id.* at 72.)
Before he was able to reverse far, he heard an unknown number of gunshots, although he did not
see where they were coming from and did not see anyone outside the vehicle that was blocking
the road.   (*Id.* at 72, 74.)   Rather than turning around as planned, he instead drove his vehicle in
reverse all the way down the remainder of Lexington Avenue and came to a stop, with his foot
on the brake and the car gear still in reverse, just before Cherry Street; he did not see anyone on
foot while he was reversing this distance.   (*Id.* at 76-81, 85.)   After he had stopped, the vehicle
that was blocking the street to the east started driving toward him; it had not moved until that
time.   (*Id.* at 86-87.)   The vehicle drove toward him, and he noticed the driver's arm was out
the window holding a gun, and that driver was shooting at him while moving toward him.   (*Id.*
at 87-88.)   Plaintiff ducked down in his vehicle, but was shot.   (*Id.* at 89-90.)   While Plaintiff
was leaning over in his vehicle and the driver was still shooting, the other vehicle struck his
vehicle on the driver's side.   (*Id.* at 90-92.)   After the impact, while still leaning down, Plaintiff
shifted his vehicle into a low forward gear and drove forward to the east down Lexington

Avenue.   (*Id.* at 93-94, 97-99.)   Plaintiff did not recall where the other car went or was located

after the collision happened, and he did not recall seeing it.   (*Id.* at 94-95.)   He drove forward

into the park and his vehicle eventually came to rest after contact with a tree.   (*Id.* at 99-100.)

He got out of the vehicle and laid down in the grass; he saw people with guns running toward

him, but he does not know if they were wearing police vests because he did not look at them.

(*Id.* at 106-08.)

At the deposition, Plaintiff attempted to explain the discrepancies between the description

of events in the Notice of Claim and the version now presented in this litigation, stating that the

Notice of Claim was just a summary and does not contain all the specifics of what happened.

(Dkt. No. 106, Attach. 2, at 21-22, 39-40, 58-59, 60-61.)   However, he did admit that the

attorney who wrote that Notice of Claim wrote what Plaintiff had told him, that Plaintiff himself

had reviewed the "[m]ajority of it," and that the details in that document "should be accurate."

(Dkt. No. 106, Attach. 2, at 22.)   When asked the name of the attorney who drafted the Notice of

Claim, he stated that he did not remember.   (Dkt. No. 106, Attach. 2, at 21-22.)

Contrary to Plaintiff's attempts to explain them, the discrepancies between the

description of events contained in the Notice of Claim and that presented in this litigation cannot

be explained merely by the Notice of Claim being less detailed or less specific.   The two

versions presented in those are different, most notably in four material respects: (1) in the

original version Plaintiff does not allege that he heard gunshots until he was already well into the

act of reversing down Lexington Avenue (at which point he also saw the gunmen around his

car), while in the newer version it was the sound of gunshots from an unseen source that

prompted Plaintiff's decision to reverse the length of that street; (2) in the original version

Plaintiff saw individuals on the street throughout much of the relevant part of the encounter, including the individuals running on either side of his car as he was reversing, while in the newer version Plaintiff did not see any individuals on foot until his car eventually crashed in the park at the end of the encounter; (3) in the original version it was individuals on foot, as well as a person in a car, who were shooting at him, while in the newer version only an individual in a car was shooting at him; and (4) in the original version (and even in the version presented in the Complaint) the other car crashed into Plaintiff's vehicle either while he was still reversing or nearly contemporaneous with when he stopped reversing, while in the newer version that car did not start even driving towards him until after Plaintiff had come to a stop by Cherry Street. These vastly different versions of events raise serious questions as to whether Plaintiff's testimony on this issue can be relied upon as evidence to preclude an entry of summary judgment, particularly because the version in his Notice of Claim, which was prepared only a few months after the events they describe occurred, is far more consistent in a lot of respects (although certainly not wholly consistent) with the version of events alleged by Defendants.

Nor does Plaintiff offer any plausible explanation for the discrepancies between his statements in his opposition to the Defendants' motions, but instead argues that the statements he has made are neither contradictory nor incomplete.   (Dkt. No. 122, at 6-7.)   Plaintiff argues that the differences between his Notice of Claim and deposition testimony are only "slight and explainable," without elaborating much on why he so believes.   (*Id.* at 7.)   Indeed, the only explanation that Plaintiff gives for the discrepancies, apart from the one he offered at the deposition itself, is that, "[a]lmost a full seven years after a traumatic incident it is understandable that [Plaintiff] may not have remembered what seemed like an inconsequential

part of this incident."  (*Id.* at 7-8.)   However, as Defendants argue in reply, Plaintiff did not express any difficulty remembering the relevant events, either at the time of filing the Notice of Claim or at his deposition; he provided quite clear testimony regarding the circumstances at issue and affirmatively stated that many of the details noted in the Notice of Claim were inaccurate, not that he did not remember those details having happened.   Further, the Court does not agree with Plaintiff that the discrepancies that have been highlighted above are slight or relate to only inconsequential parts of the relevant incident.   Where the three Defendants were located, what those Defendants were doing while Plaintiff was reversing his car, and when the first shots were fired are all core material facts at the heart of Plaintiff's causes of action.   Because the explanations provided by Plaintiff do not plausibly explain the significant discrepancies in his various statements about what happened during the incident, and the Court can see no other plausible explanation that would explain them, this is indeed one of the rare cases in which it would be impossible for the Court to render a decision on the summary judgment motions without conducting some assessment of the credibility of the testamentary evidence on which Plaintiff exclusively relies in asserting the existence of genuine disputes of material fact.

### 2.   Application to Plaintiff's First Claim

Of course, whether Plaintiff's credibility is reasonably questioned is not the end of the Court's analysis of Plaintiff's First Claim.   To determine whether Plaintiff's inconsistent statements create a genuine dispute of material fact regarding the circumstances underlying Plaintiff's First Claim, the Court must assure itself both that there is nothing in the record to support Plaintiff's relevant allegations other than his own testimony, and that, even after drawing all inferences in the light most favorable to Plaintiff, no reasonable person could believe his

testimony.  *Jeffreys*, 426 F.3d at 555.   Because the operative claim in this matter is the First

Claim for excessive force (given that there can be no successful claim of failure to intervene in

the absence of a constitutional violation), the Court's analysis will chiefly focus on the evidence

as it pertains to that claim.

Having carefully considered whether there is other evidence in the record that would

support Plaintiff's various allegations regarding the events of July 22, 2015, the Court finds that

there is nothing in the hundreds of pages of evidence that have been submitted with the parties'

papers on the motions here that can reasonably be said to corroborate many of the key portions

of Plaintiff's testimony related to whether Defendant Falkowski's use of force was justified.

*See, e.g.*, *Saeli v. Chautauqua Cnty, N.Y.*, 36 F.4th 445, 456-57 (2d Cir. 2022) (finding the

plaintiff's statements that he submitted an informal grievance on a specific date to be so

inconsistent with both his prior statements that he had been intimidated into not submitting his

grievance and with the document itself that a reasonable jury could not believe that he properly

complied with the grievance process in a timely manner); *Bryant v. Iheanacho*, 859 F. App'x

604, 605 (2d Cir. 2021) (applying *Jeffreys* and finding that no reasonable juror could credit

plaintiff's inconsistent statements about whether the defendants had evaluated him because there

was no other evidence offered to contradict the evidence indicating they had indeed conducted

evaluations); *cf. Fischl v. Armitage*, 128 F.3d 50, 56 (2d Cir. 1997) (finding district court

inappropriately assessed the credibility of the plaintiff's reports of having been attacked based on

inconsistencies in his accounts of the event, where there were photographs and hospital records

documenting evidence of injuries consistent with his reports of an assault).

As an initial matter, as was discussed above, Plaintiff pled guilty to a charge of Reckless

Endangerment in the Second Degree, N.Y. Pen. L. § 120.20, related to the events underlying his claims in this case.   (Dkt. No. 106, Attach. 21.)   By definition, "[a] person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person."   N.Y. Pen. L. § 120.20.   At the plea colloquy, Plaintiff indeed admitted that he "recklessly engaged in conduct which created a substantial risk of serious physical injury to another person."   (Dkt. No. 106, Attach. 21, at 9-10.)   This conviction, while not necessarily precluding Plaintiff from asserting a claim for excessive force (given that there are other factors apart from whether the relevant conduct posed an immediate threat to the safety of the officers or other persons that must be considered when assessing whether a use of force was reasonable that may, in some cases, tip the balance against reasonableness) does, as Defendants argue, preclude him from arguing that his conduct while driving did not create a substantial risk of serious harm to persons around him.   *See Heck v. Humphrey*, 512 U.S. 477 (1994) (holding that, in order to recover damages for allegedly unconstitutional harms caused by actions whose unlawfulness would render a conviction invalid, the plaintiff must show that the conviction has been reversed, expunged, declared invalid, or called into question by a federal court on a writ of habeas corpus; if the conviction has not been invalidated, the claim is not cognizable under Section 1983); *see also Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019) (quoting *Graham v. Connor*, 490 U.S. 386, 397 [1989]) (stating that "[a]n excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances," and that "[t]he proper application of the reasonableness standard, according to the *Graham* Court, 'requires careful attention to the facts and circumstances of each particular

case, including' (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight'").   That Plaintiff argues his plea did not include an admission that he created a serious risk of harm specifically to the relevant Defendant officers is of no moment.   The *Graham* court noted that the relevant consideration is whether the actions posed a threat to the safety of officers *or others*.   *Graham*, 490 U.S. at 397. Consequently, it can be taken as an established fact that Plaintiff indeed did pose a substantial risk of serious harm to persons in the vicinity (whether those persons are the Defendant officers or not), and thus a reasonable factfinder could not find otherwise, regardless of what Plaintiff's testimony might otherwise suggest.   By logical extension, no reasonable factfinder could therefore credit Plaintiff's testimony to the extent his alleged version of events attempts to suggest he did not pose such a risk to others, including Defendants, during the relevant events.

In terms of the physical evidence presented, there is no evidence that corroborates Plaintiff's deposition testimony that he heard gunshots from the eastern direction (where the car he reports the later gunshots came from was located) while he was just beginning to reverse his vehicle, or that Defendant Falkowski shot at him while driving westward down the length of Lexington Avenue towards his car.   The proffered evidence, which includes a police inventory, pictures of the scene with markers, and a diagram of the scene where bullet casings were located (the accuracy of that diagram has not been disputed, as discussed above in Part I.B. of this Decision and Order), all show that the only bullet casings found at the scene were present near the intersection of Lexington Avenue and Cherry Street, and none were seemingly recovered either near the location where Defendant Falkowski's vehicle first stopped to block the east end

of Lexington Avenue or along the portion of Lexington Avenue he traversed to get to Cherry Street.   (Dkt. No. 106, Attach. 28; Dkt. No. 106, Attach. 40; Dkt No. 106, Attach. 41; Dkt. No. 116, at 9.)   There is therefore no physical evidence to support Plaintiff's testimony that shots were fired from anywhere to the east of where his car originally began reversing, nor at any place along Lexington Avenue other than by the intersection with Cherry Street.   Given that there is also no evidence that any of the Defendants were located near Cherry Street around the time Plaintiff began to back up, there is also no evidence that would support a finding that any officers began firing at him from that direction before he had reversed down Lexington Avenue; notably, there is no evidence, even in Plaintiff's own testimony, to contradict the testimony of Defendants and other non-party officers that, at the time Plaintiff was beginning to reverse, Defendant Falkowski was located in front of him to the east, and Defendants Eiffe and Ballagh were located directly behind or near the tan vehicle that was parked not far to the west of Plaintiff's vehicle, none of which is in the area near Cherry Street where the bullet casings were found.   From this evidence of the location of the bullet casings, no reasonable factfinder could credit Plaintiff's testimony that one of the Defendant officers was shooting at him as he was just beginning to reverse his vehicle.

Further, pictures of the vehicles driven by Plaintiff and Defendant Falkowski do not reasonably corroborate Plaintiff's testimony that Defendant Falkowski crashed into the driver's side of Plaintiff's vehicle.   Photographs show damage, including denting and scratches, along the driver's side of Defendant Falkowski's vehicle from the area approximately directly behind his front wheel to the back of the vehicle.   (Dkt. No. 106, Attach. 33, at 5-8.)   Of note, the photographs show significant denting and crumpling on the lower portions of both doors on the

driver's side of Defendant Falkowski's vehicle.   (*Id.* at 5-6.)   They further show no apparent damage to the front of Defendant Falkowski's vehicle.   (*Id.* at 4.)   The two photographs of Plaintiff's vehicle show no damage to the front of that vehicle, and no apparent signs of a collision in the area of his front driver's side wheel, although there are bullet holes in the body of the vehicle in this area.   (Dkt. No. 106, Attach. 106, 33, at 2-3.)   While there do not appear to be photographs of the remainder of the body of Plaintiff's vehicle, these proffered photographs, particularly those of the damage to the driver's side of Defendant Falkowski's vehicle, do not appear to corroborate Plaintiff's testimony that Defendant Falkowski drove into the driver's side of Plaintiff's vehicle as opposed to Plaintiff backing into Defendant Falkowski's vehicle.   The Court is not convinced that any reasonable factfinder could credit Plaintiff's account in light of the photographic evidence of the damage to the driver's side of Defendant Falkowski's vehicle.

Moreover, whether there might be genuine disputes of material fact regarding how exactly the collision happened between Defendant Falkowski's vehicle and Plaintiff's vehicle, such disputes are not dispositive here, because Defendants raise two other separate occurrences during the incident that they assert provide justification for the force used: the fact that Defendant Falkowski and Defendant Ballagh both believed that Plaintiff was either trying to hit or did hit Defendant Eiffe while reversing (and Defendant Eiffe himself believed Plaintiff was trying to hit him); and the fact that Defendant Falkowski believed Plaintiff was trying to hit him when Plaintiff began driving forward from Cherry Street.   It was this second incident that prompted Defendant Falkowski to shoot at Plaintiff, according to the evidence other than Plaintiff's testimony.   Such instances, which are documented in the statements and deposition testimony of the various officers at the scene, constitute sufficient grounds, by themselves or at

40

least together, to render the use of force reasonable, especially in light of the conviction for
reckless endangerment, which, as discussed, is irrefutable proof that Plaintiff was indeed posing
a serious risk of harm with his driving at the time.   *See Plumhoff v. Rickard*, 572 U.S. 765,
776-77 (2014) (finding use of deadly force in the form of multiple gunshots was reasonable
where suspect led officers on a high-speed chase and, after being stopped by a collision with a
police car, attempted to continue maneuvering his vehicle in an effort to escape); *Costello v.
Town of Warwick*, 273 F. App'x 118, 119 (2d Cir. 2008) (finding use of deadly force in the form
of multiple gunshots reasonable where the suspect, while surrounded by officers and police cars,
drove forward and backward into those cars, because the shooting officer had an objectively
reasonable belief that one of the other officers might have been under the car or hurt and that the
suspect would continue to use his vehicle to inflict harm on the other officers).

The statements provided by Defendant Eiffe, Defendant Ballagh, Defendant Falkowski,
Detective Summers, Detective Metz, Detective Izzo, Detective Babbage, and Detective Baart, as
well as the depositions of the Defendants, also do not support Plaintiff's testimony.   (Dkt. No.
16, Attachs. 3, 4, 5, 13, 15, 17, 25, 30, 35, 39, 44.)   While these various statements are not
always wholly consistent with each other in all details, none of them corroborate the various
relevant aspects of Plaintiff's testimony on which he relies in an effort to show a genuine dispute
of material fact.   These statements and depositions, along with the physical and other evidence
discussed above, comprises the totality of the relevant evidence that has been provided on this
motion by either party, and none of that evidence corroborates to any appreciable degree the
testimony that Plaintiff relies upon here.   No reasonable factfinder could believe Plaintiff's
uncorroborated version of events despite these multiple witnesses that contradict his deposition

testimony.

Further, whether or not Plaintiff's testimony that he did not see any of Defendants on foot in the middle of the street during the relevant times when he was either reversing his car down Lexington Avenue or driving forward toward Lexington Park is truthful, such fact would be immaterial to the issues presented by his excessive force claim.   Specifically, there is no requirement that Plaintiff must have been *intentionally* attempting to harm either the Defendants or others in order for the use of force to be considered reasonable.   Rather, the law is clear that the requisite inquiry is from the perspective of how the relevant officers interpreted the circumstances presented at the time they were facing those circumstances, not the intention of the person subject to force.   Indeed, Plaintiff pled guilty to reckless endangerment, by which he has recognized that his reckless conduct was sufficient to create a serious risk of harm.   Given that all of the other evidence corroborates that the officers were on foot around his car at the time he was driving, and that they witnessed Plaintiff appearing to drive at themselves or other officers, a reasonable factfinder would have to conclude that the officers were indeed on foot around the car while Plaintiff was driving, whether or not he saw them.

In sum, nothing in the evidence presented on these motions corroborates the version of events presented in Plaintiff's material inconsistent testimony, and indeed that other evidence appears to directly contradict key parts of it.   Even drawing all reasonable inferences in favor of Plaintiff, the Court concludes that no reasonable factfinder could believe Plaintiff's testimony as to the facts relevant to his claim of excessive force.   As a result, Plaintiff has not shown that there is a *genuine* issue of material fact regarding the propriety of Defendant Falkowski's use of force, and the Court grants summary judgment to the Defendants on Plaintiff's First Claim.

**B.     Whether Summary Judgment is Appropriate on Plaintiff's Second Claim**

After careful consideration, the Court answers the above question in the affirmative for

the reasons stated in Defendants' memoranda of law.   *See supra,* Parts I.C.1 and I.C.2 of this

Decision and Order.   To those reasons, the Court adds the following analysis.

Having already concluded that summary judgment is appropriate on Plaintiff's First

Claim for excessive force, the Court also finds summary judgment appropriate on Plaintiff's

Second Claim for failure to intervene to prevent or stop a constitutional violation.   "It is well

settled that an underling constitutional violation is a precondition of a failure-to-intervene claim,

. . . and thus [w]here the record does not disclose an underlying excessive force violation, . . .

summary judgment on a duty to intercede claim is appropriate."   *Livingston v. Hoffnagle*,

19-CV-0353, 2021 WL 3888283, at *6 (N.D.N.Y. Aug. 3, 2021) (Hummel, M.J.) (internal

quotation marks and citations omitted); *accord Harig v. City of Buffalo*, 22-30-cv, 2023 WL

3579367, at *5 (2d Cir. 2023).   Defendants' motions for summary judgment are therefore also

granted as to Plaintiff's Second Claim.

**C.     Whether Summary Judgment is Appropriate on Plaintiff's Third Claim**

After careful consideration, the Court answers the above question in the affirmative.

Plaintiff indicated in his opposition memoranda of law that he wishes to voluntarily dismiss this

claim with prejudice.   (Dkt. No. 122, at 9.)   Indeed, Plaintiff did not dispute any of the asserted

facts related to this claim, and has not presented any evidence to contradict the evidence showing

that officers quickly applied pressure to his gunshot wound, made multiple calls for an

ambulance within a minute of reporting that shots had been fired, and that he arrived at the

hospital in an ambulance within approximately 23 minutes of the call reporting that shots had

been fired.   There is therefore no genuine dispute of material fact as to this claim, and the evidence is sufficient for the Court to conclude that Defendants provided adequate and timely medical assistance.   *See Campbell v. City of Yonkers*, 19-CV-9444, 2023 WL 4867459, at *14 (S.D.N.Y. July 31, 2023) (finding no denial of adequate medical care where the defendants called for an ambulance within a minute after the shooting occurred and also performed CPR until emergency medical professionals arrived); *Ridgeway v. City of Syracuse*, 16-CV-0618, 2019 WL 416148, at *12 (N.D.N.Y. Feb. 1, 2019) (Suddaby, C.J.) (finding no denial of adequate medical care where officers called for an ambulance within less than a minute of the shooting and staunched the plaintiff's wound until medical personnel arrived on scene approximately five minutes later).   Defendants' motions for summary judgment are also granted as to Plaintiff's Third Claim.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motions for summary judgment (Dkt. Nos. 106, 107, 115) are **GRANTED**; and it is further

**ORDERED** that Plaintiff's First Claim for excessive force against Defendant Falkowski is **DISMISSED**; and it is further

**ORDERED** that Plaintiff's Second Claim for failure to intervene against Defendant Eiffe and Defendant Ballagh is **DISMISSED**; and it is further

**ORDERED** that Plaintiff's Third Claims for denial of adequate and timely medical care against Defendants Eiffe, Ballagh, and Falkowski are **DISMISSED**; and it is further

**ORDERED** that Defendants' motions to strike are **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED**.

The Court certifies that an appeal from this Decision and Order would not be taken in good faith.

Dated: March 19, 2024
       Syracuse, New York

Glenn T. Suddaby
U.S. District Judge